| | |
|---|---|
| PAUL D. HERMAN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| ISAAC GRIER, et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** comes before the Court on Defendants' Motion for Summary Judgment, (Doc. No. 19). Also pending is Plaintiff's Motion to Appoint Counsel, (Doc. No. 25).

**I.     BACKGROUND**

*Pro se* Plaintiff filed this civil rights suit pursuant to 42 U.S.C. § 1983 while incarcerated at the Mountain View Correctional Institution. (Doc. No.1 ). The Complaint passed initial review on Plaintiff's retaliation claims against Defendants Tommy Buchanan, Isaac Grear, and Daniel Tunks. Defendants have now filed a Motion for Summary Judgment.

**(1)     Complaint** (Doc. No. 1)

Construing the Complaint liberally and accepting the allegations as true, Defendant Grear ordered Plaintiff out of his cell for a cell search on March 6, 2018. Plaintiff promptly complied. Grear began throwing papers in the air and threw Plaintiff's pillowcase, sheets, blankets, and cosmetics on the floor. Plaintiff asked why he was doing it and Grear responded "cause I can!" and that Plaintiff should write a grievance if he does not like it and that "nobody is going to do nothing" to Grear. (Doc. No. 1 at 11). Plaintiff wrote a grievance and gave it to Aldridge who, in turn, gave it to Grear. They began laughing and Grear demonstrated how he "demolished"

1

Plaintiff's room. (Id.). Plaintiff had his mother report Grear to Area Administrator David Mitchell and Defendant Slagle. In the following weeks, Plaintiff was constantly harassed by Tunks and Grear, who repeatedly stated that would "teach" Plaintiff about going over their heads. (Id.).

On March 31, 2018, Tunks called Plaintiff to his office and said he heard Plaintiff was "paying some serious money to get Grier killed" and that he had statements from several inmates who said Plaintiff had tried to hire them to kill Grear. (Id.). Plaintiff denied the allegations and Tunks ordered Plaintiff to get out of his face. Approximately two hours later, Plaintiff was called out of the recreation yard to Tunks' office to see Lieutenant Buchanan, who said "oh, this is the smart ass that likes calling home and then trying to get an officer killed." (Doc. No. 1 at 12). Buchanan said he would put Plaintiff somewhere with no phone for a year to show him "how we do things up here." (Id.). Plaintiff was then placed in segregation from March 31 to April 4, 2018. Grear, Tunks and Buchanan retaliated against Plaintiff by conspiring to bring false disciplinary charges against him.

Plaintiff seeks declaratory and injunctive relief and compensatory and punitive damages.

**(2)** **<u>Defendants' Motion for Summary Judgment</u>** (Doc. No. 19)

Defendants argue that Plaintiff failed to demonstrate a civil rights violation because he cannot show that Defendants unlawfully retaliated against him. Plaintiff fails to make any specific allegations related to how Defendants harassed him or conspired to bring false allegations against him. Plaintiff was not placed in restrictive housing because he filed a grievance against Defendant Grear, but rather, there was an ongoing investigation. No disciplinary action was taken against Plaintiff related to the investigation of the letter and the record shows that Plaintiff was never

assigned to administrative segregation after his return to regular population on April 4, 2018. Therefore, Plaintiff fails to show a retaliatory adverse act or actual injury.

Defendants argue that they are entitled to summary judgment as to Plaintiff's claims for damages against Defendants in their official capacities, and that qualified immunity shields them from claims for monetary damages in their individual capacities. Plaintiff has not shown that Defendants acted in violation of clearly established law and, to the extent that Plaintiff alleges that any Defendant violated NCPDS policy, an alleged violation of prison policy do not generally rise to the level of a constitutional violation.

Finally, Defendants argue that they are entitled to prevail as a matter of law as to Plaintiff's punitive damages claims because no evidence exists of aggravated conduct sufficient to create an issue of fact with regards to punitive damages.

**(3)** **Plaintiff's Response**

The Court issued an Order pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), on August 20, 2019 informing Plaintiff of the legal standards applicable to summary judgment motions and ordering him to file a response within 14 days. The Court cautioned Plaintiff that "[f]ailure to to file a timely and persuasive response will likely lead to the relief the moving Defendants seek by way of summary judgment." (Doc. No. 26 at 3). Plaintiff has failed to file a response to the Motion for Summary Judgment and the time to do so has expired.

**(4)** **Evidence**[1]

    **(A)** **Affidavit of Isaac Grear** (Doc. No. 22)

---

[1] This section is not exhaustive.

Defendant Grear is a Correctional Officer II at Mountain View C.I. Defendant Grear is familiar with NCDPS policies and procedures and is trained and experienced in the management of inmates.

Defendant Grear did a routine cell search of cell F-318 where Plaintiff was housed in March 2018. NCDPS Policy and Procedures, Chapter .0100, address searches of an inmate's quarters and effects. See (Doc. No. 22 at 5-9). During the search, Defendant Grear notice a hole in Plaintiff's coat and Grear pulled on the coat to ensure there was no hidden contraband in the coat. Plaintiff was "agitated" and demanded a new coat. (Doc. No. 22 at 2). Grear recalls telling Plaintiff about the laundry request procedures in order to be issued a new jacket. Grear removed the mattress cover to ensure there was no contraband hidden in it. He did not damage Plaintiff's mattress during the search. All of Plaintiff's property was placed on his bunk after it Grear inspected it for contraband. Grear did not throw anything on the floor. The search was conducted in accordance with applicable NCDPS policy and procedure. Grear "was not angry at Plaintiff nor did [he] intend to damage Plaintiff's personal property or any State property [and Grear] was not acting out of spite or malice." (Doc. No. 22 at 2).

As a Correctional Officer at Mountain View C.I., Grear does not make decisions related to assigning an inmate confined at Mountain View to the segregation/restrictive housing unit, nor can he charge an inmate with a disciplinary infraction. This is outside Grear's job duties and responsibilities. Grear made no decisions related to either Plaintiff's housing assignments or being charged with disciplinary infractions while Plaintiff was housed at Mountain View. Grear did not treat Plaintiff in an unprofessional manner, nor did he observe Defendants Tunks and Buchanan doing so. Grear did not harass, intimidate or retaliate against Plaintiff because Plaintiff filed a grievance against him for the March 2018 cell search. Grear denies that, in performing his duties

as a Correctional Officer at Mountain View C.I., he violated any rights secured to Plaintiff under the laws of the State of North Carolina or the Constitution and laws of the United States.

**(B)** **Affidavit of Daniel Tunks** (Doc. No. 23)

Defendant Daniel Tunks has been a Correctional Sergeant since July 2014 at the Mountain View C.I. and is currently a Correctional Sergeant II. Tunks is familiar with NCDPS policies and procedures and is trained and experienced in the management of inmates.

On March 2, 2018, Plaintiff approached Tunks and told him that Defendant Grear had searched his cell and threw his personal belongings everywhere. Tunks went to view Plaintiff's assigned cell and observed that the cell had been searched but none of Plaintiff's personal property appeared damaged. Defendant Grear had inspected Plaintiff's State issued clothes for contraband consistent with the applicable NCDPS policy and procedure related to Operational Searches. See (Doc. No. 22 at 5-9). Any item found that was damaged or altered was taken. Plaintiff was told to fill out a Laundry Request for new clothes. No disciplinary action was taken against Plaintiff related to this incident or any report that he made to Tunks related to Grear's search of the cell. Plaintiff was not charged or found guilty of a disciplinary offense for damaged or altered State issued clothing or for non-threat contraband. A review of Plaintiff's Disciplinary Infraction History shows no disciplinary infractions for his current period of incarceration. (Doc. No. 23 at 5).

Plaintiff was upset that Tunks did not agree that Grear had destroyed his assigned cell. Tunks encouraged Plaintiff to write a grievance, which Plaintiff did. (Doc. No. 23 at 6-10).

On March 31, 2018, Tunks was conducting a routine search of inmate outgoing mail in a drop box. He found an anonymous letter in the box that alleged that Plaintiff had put a "hit" on Defendant Grear because he had been disrespected over the cell search. (Doc. No. 23 at 3). Tunks

5

turned the letter over to the Officer in Charge ("OIC"), Defendant Buchanan. Later that same day, Plaintiff was placed in administrative restrictive housing pending an investigation into the validity of the letter. No evidence was found to support the letter and Plaintiff was released back to regular population on April 4, 2018. Plaintiff was not placed in restrictive housing because he filed a grievance against Defendant Grear.

Defendant Tunks did not treat Plaintiff in an unprofessional manner and did not observe Defendants Grear and Buchanan treat him in an unprofessional manner. Defendant Tunks did not harass, intimidate, or retaliate against Plaintiff because he filed a grievance against Defendant Grear for the March 2018 cell search. Defendant Tunks denies that, in performing his duties as Correctional Sergeant at Mountain View, he violated any rights secured to Plaintiff under the laws of the State of North Carolina or the Constitution and laws of the United States.

**(C)** **Affidavit of Tommy Buchanan** (Doc. No. 24)

Defendant Tommy Buchanan was promoted to a Correctional Lieutenant at Mountain View C.I. in 2017 and is currently a Correctional Lieutenant II. Buchanan is familiar with NCDPS policies and procedures and is trained and experienced in the management of inmates. As a Correctional Lieutenant at Mountain View, Defendant Buchanan has direct access to the Offender Population Unified System ("OPUS") database and can review Plaintiff's electronic prison records including an offender's disciplinary history, control history, and housing assignments.

On March 31, 2018, Defendant Buchanan went to the East Unit to talk to Defendant Tunks about an anonymous letter that was left in the outgoing inmate mailbox that included an allegation about a possible assault on Defendant Grear. Defendant Buchanan read the letter and recalled that it included statements that Plaintiff was going to pay money to three other inmates to assault Grear.

As the OIC, Defendant Buchanan began an investigation into the allegations that were made in the letter.

Defendant Buchanan is a Security Risk Group ("SRG") Facility Intelligence Officer ("FIO") at Mountain View. Defendant Buchanan discovered that the three inmates named in the letter were confined at Mountain View and had SRG affiliations as United Blood Nation members.

Plaintiff was called to the East Unit's Sergeant office and was asked if he had a problem with Defendant Grear. Plaintiff stated that Grear had destroyed his cell. Defendant Buchanan asked if Defendant Grear had done a cell search and Plaintiff said "yes." (Doc. No. 24 at 2). Plaintiff was asked if he had offered money to get Grear hurt or killed and he replied "I would not say that." (Id.). Defendant Buchanan advised Plaintiff that he would be placed on administrative restrictive housing ("RHAP") pending an investigation into the validity of the letter, consistent with NCDPS Policy and Procedures, Chapter C, Section .0300. See (Doc. No. 24 at 6-7). Plaintiff as escorted to RHAP.

At no time did Defendant Buchanan threaten or curse Plaintiff. NCDPS policies and procedures were followed in placing Plaintiff in restrictive housing. Defendant Buchanan's investigation into the alleged plot against Grear included interviewing Grear, who was not aware of any alleged plot, and the three inmates named in the letter. The investigation was completed and no evidence was found to support the letter. Plaintiff was then released back into regular population on April 4, 2018. (Doc. No. 24 at 8-14). Plaintiff was not placed in restrictive housing because he filed a grievance against Defendant Grear. No disciplinary action was taken against Plaintiff related to the investigation of the letter, and Plaintiff has no disciplinary infractions for his current period of incarceration.

7

Defendant Buchanan did not treat Plaintiff in an unprofessional manner and did not observe Defendants Tunks and Grear doing so. Defendant Buchanan did not harass, intimidate, or retaliate against Plaintiff because he filed a grievance against Defendant Grear for the March 2018 cell search. Defendant Buchanan denies that, in performing his duties as a Correctional Lieutenant at Mountain View, he violated any rights secured to Plaintiff under the laws of the State of North Carolina or the Constitution and laws of the United States.

## II.    LEGAL STANDARDS

**(1)    Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient

evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. Celotex, 477 U.S. at 324; Kipps v. Ewell, 538 F.2d 564, 566 (4th Cir. 1976); Fed.R.Civ.P. 56(e).

A verified complaint is the equivalent of an opposing affidavit for summary judgment purposes when the allegations are based on personal knowledge. Davis v. Zahradnick, 600 F.2d 458, 459–60 (4th Cir.1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment). However, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Smith v. Ozmint, 578 F.3d 246, 254 (4th Cir. 2009) (citing Scott v. Harris, 550 U.S. 372, 380 (2007)).

 **(2)** **Retaliation**

Prison officials may not retaliate against an inmate for exercising a constitutional right. See Hudspeth v. Figgins, 584 F.2d 1345, 1347 (4th Cir.1978). To succeed on such a claim, a plaintiff

must first allege that "the retaliatory act was taken in response to the exercise of a constitutionally protected right...." Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994). Thereafter, a plaintiff must demonstrate that he suffered some adverse impact or actual injury. See American Civil Libs. Un. of Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir. 1993) (citing Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1140 (4th Cir. 1990)). In addition, a plaintiff must come forward with specific evidence "establish[ing] that but for the retaliatory motive the complained of incident[s] ... would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995); accord Ponchik v. Bogan, 929 F.2d 419, 420 (8th Cir.1991) (plaintiff must show that action would not have occurred "but for" the alleged reprisal); Collinson v. Gott, 895 F.2d 994, 1002 (4th Cir. 1990) (Phillips, J., concurring); McDonald v. Hall, 610 F.2d 16, 18–19 (1st Cir.1979). In the prison context, such claims are treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct." Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).

**(3)** **Sovereign Immunity**

The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. Will v. Michigan Dep't of State Police, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. Bright v. McClure, 865 F.2d 623, 626 (4th Cir. 1989) (citing McConnell v. Adams, 829 F.2d 1319, 1328 (4th Cir. 1987)).

"[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Kentucky v. Graham, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer

in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(4)** **<u>Qualified Immunity</u>**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

**(5) Punitive Damages**

A jury may be permitted to assess punitive damages in a § 1983 action when the defendant's conduct is shown to be "motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others" Smith v. Wade, 461 U.S. 30, 51 (1983).

**III. DISCUSSION**

**(1)     Retaliation**

Defendants have submitted evidence demonstrating that Plaintiff's cell was searched in accordance with NCDPS policy, that he was placed in restrictive housing pursuant to NCDPS policy when an anonymous letter about a "hit" on Grear was being investigated, and that no disciplinary action, harassment, or other actions occurred in retaliation for Plaintiff's grievance against Grear. Plaintiff has not attempted to rebut Defendants' evidence demonstrating that no retaliation occurred. Plaintiff has thus failed to demonstrate the existence of a genuine dispute of material fact with regards to his retaliation claim, and therefore, Defendants' Motion for Summary Judgment will be granted.

**(2)     Sovereign Immunity**

Plaintiff's claims for damages against Defendants in their official capacities are barred by sovereign immunity. See Almone, 478 F.3d at 106; Hutto, 773 F.3d at 549. Therefore, Defendants' Motion for Summary Judgment for damages will also be granted on that basis.

**(3)     Qualified Immunity**

Defendants argue that qualified immunity shields them from damages in their individual capacities because Plaintiff has not established a clearly established violation of law. Plaintiff has failed to demonstrate that any retaliation occurred, and therefore, Defendants are entitled to qualified immunity on that basis.

**(4)     Punitive Damages**

Finally, Defendants are further entitled to summary judgment because Plaintiff has failed to demonstrate that any violation occurred, much less one involving evil motive or intent or reckless or callous indifference to the federally protected rights of others. Smith, 461 U.S. at 51.

### IV. PENDING MOTION

Plaintiff has filed a Letter that has been docketed as a motion stating that he seeks "a attorney of your courts for my exhaustion of administrative remedies." (Doc. No. 25 at 1). He further states that he needs a "courts of appealed attorney" for his case and that he "[does not] have attorney fees [that he] can pay and needs the court's help in this matter." (Id.).

Plaintiff has previously requested the appointment of counsel, which was denied. (Doc. Nos. 3, 9). To the extent that Plaintiff is again requesting the appointment of counsel, the instant Motion is denied for those same reasons. To the extent that Plaintiff is requesting additional relief relating to the exhaustion of administrative remedies and an appellate lawyer, the Court is unable to determine the nature of Plaintiff's request, and therefore, the remainder of the Motion will be denied.

### V. CONCLUSION

Based on the foregoing, Defendants' Motion for Summary Judgment is granted, Plaintiff's Motion to Appoint Counsel, is denied, and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 19), is **GRANTED.**
2. Plaintiff's Motion to Appoint Counsel, (Doc. No. 25), is **DENIED**.
3. The Clerk of Court is instructed to close this case.

Signed: September 18, 2019

Frank D. Whitney
Chief United States District Judge